# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **United States of America** | ) | |
| **ex rel. REGINALD KELLEY (K-54728),** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 03 C 5111** |
| **vs.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **TERRY McCANN, Warden,** | ) | |
| **Stateville Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

In his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, petitioner

Reginald Kelley ("Kelley") challenges his convictions for first degree murder, attempted first

degree murder and armed violence. The Respondent Terry McCann, the Warden of the

Stateville Correctional Center ("Respondent"), has filed an answer to the petition.[1] For the

reasons stated below, Kelley's petition is denied.

## HABEAS STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this court

must deny Kelley's petition for a writ of habeas corpus with respect to any claim adjudicated on

the merits in the state court unless the state court's decision "was contrary to, or involved an

---

[1]At the time Kelley filed his petition, he was incarcerated at the Menard Correctional Center. As a result, pursuant to Rule 2(a) of the Rules Governing Section 2254 cases in the United States District Courts, the warden of that facility, Eugene McAdory, was the proper party respondent. After the briefing on Kelley's habeas petition was concluded, Kelley was transferred to the Stateville Correctional Center in Joliet, Illinois, at which Terry McCann ("McCann") is Warden. Accordingly, since McCann is now the State officer in custody of Kelley, he is substituted as the proper party respondent. *See* Rule 2(a) of the Rules Governing § 2254 Cases in the United States District Courts; Fed. R. Civ. P. 25(d)(1); *Rumsfeld* v. *Padilla*, 542 U.S. 426, 435, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004) (citing *Hogan* v. *Hanks*, 97 F.3d 189, 190 (7th Cir. 1996)).

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Price* v. *Vincent*, 538 U.S. 634, 638, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003). A state court's decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]," or if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams* v. *Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L. Ed. 2d 389 (2000). In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Schultz* v. *Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.").

Before reviewing the state court's decisions, however, the court must determine whether Kelley fairly presented his federal claims to the state courts, as any claim not presented to the state's highest court is deemed procedurally defaulted. *O'Sullivan* v. *Boerckel*, 526 U.S. 838, 844-45, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). Moreover, "[a] federal court will not review a question of federal law decided by a state court if the decision of the state court rests on a state procedural ground that is independent of the federal question and adequate to support the judgment." *Moore* v. *Bryant*, 295 F.3d 771, 774 (7th Cir. 2002). A federal court may not grant

2

habeas relief on a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman* v. *Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Anderson* v. *Cowen*, 227 F.3d 893, 899 (7th Cir. 2000).

## BACKGROUND

On July 25, 1994, at approximately 10:30 p.m., Ebony Collins, her three-year old son Kevin Taylor, Jr. ("K.T."), her father Ronnie Cole, her friend Lashon Johnson, and her brother Ronnie Collins were gathered at Ms. Collins's mother's house, located on Exchange Street on the southeast side of Chicago, Illinois.[2]  The group decided to drive to a grocery store located at 79th Street and Yates Boulevard in a white Chevy Caprice.  K.T. sat in between Ms. Collins, while Ms. Johnson sat behind Mr. Cole.  K.T.'s head was visible from the rear of the vehicle, as it extended above the front seat.

After leaving her mother's house, Ms. Collins drove southbound on Yates Boulevard to 79th Street.  Ms. Collins and Ms. Johnson went into the store, purchased some items and returned to their respective seats in the car.  Thereafter, Ms. Collins pulled out onto Yates Boulevard and proceeded northbound to 75th Street, where she stopped the car for a red light.  As the vehicle stopped, Ms. Collins, Mr. Collins and Mr. Cole noticed a group of approximately six people standing on the northeast corner, approximately 25 feet away.  Ms. Collins and Mr. Cole noticed

---

[2]When considering a habeas petition, the court must presume that the state courts' factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Todd* v. *Schomig*, 283 F.3d 842, 846 (7th Cir. 2002).  Kelley has not presented clear and convincing evidence to rebut this presumption.  Therefore, the court adopts and sets forth hereafter the Illinois Appellate Court's recitation of facts in *People* v. *Kelley*, No. 1-97-1069 (2nd Div. 1999) (Resp. Ex. C) (Kelley I) and *People* v. *Kelley*, No. 1-00-0764 (1st Div. 2002) (Resp. Ex. J) (Kelley II).

a boy whose hair was in french braids and who was wearing red shorts and a white T-shirt with stripes on the sleeve staring at the car.  The boy in the red shorts and another boy dressed in dark clothes broke away from the group and crossed the street in front of the car, walking toward the northwest corner.  While crossing the street and still staring at the car, the boy in the red shorts began lifting up his shirt in the area of his waistband.

The light turned green and Ms. Collins began to drive through the intersection.  Ms. Collins and Mr. Collins noticed the boy in the red shorts throw gang signs in the air.  When the car was approximately 10 feet away from the boy, Ms. Collins heard someone through the open driver's side car window say, "Ain't that the motherfucking car right there?"  At the same time, Mr. Collins saw the face of the boy in the red shorts and both Mr. Collins and Ms. Johnson watched the boy "fiddle with his shirt," revealing a black object tucked in the waistband of his shorts.  The car was approximately 50 feet away from the boys when Ms. Johnson saw the right arm of the boy in the red shorts extend to a 90-degree angle and further saw three flashes exit from where his arm was extended.  Ms. Collins, Mr. Collins and Ms. Johnson heard three gunshots, which they described as sounding like a car backfiring; Mr. Cole heard approximately two shots.  Then, the back windshield shattered.  Mr. Cole yelled that he had been hit and K.T. began to cry.  Ms. Johnson saw blood on Mr. Cole's arm and, when K.T. was lifted up, she saw blood from K.T.'s head.  Mr. Collins saw two holes in his father's arm and a hole in the back left side of his nephew's head.  Ms. Collins looked at K.T. and saw that he had been shot in the back of the head.  She then became hysterical and Mr. Cole told her to let Mr. Collins drive them to the hospital.

Once at Jackson Park Hospital, Mr. Cole was treated for multiple gunshot wounds. After being transferred from Jackson Park Hospital to Wyler's Hospital, K.T. died from a single gunshot wound to the head. That same evening, police officers recovered six .9 millimeter shell casings..

On July 29, 1994, Officer James Oliver picked up Ms. Collins and her sister Melissa in a green Jeep Cherokee with dark tinted windows. The three drove to the Gatlings Funeral Home, located at 102nd Street and Halsted Avenue, and parked across the street, approximately 50 to 75 feet from the entrance. Approximately 200 to 300 people, from ages 16 to 26, were present. The people were predominantly young black men of various heights, weights, hairstyles and clothes. After 15 or 20 minutes, Ms. Collins identified Kelley and Jernel Brown as two of the boys present on July 25, 1994. Kelley was wearing a white T-shirt, black pants and gym shoes with red shoestrings, and his hair was in french braids. Ms. Collins recognized Kelley's face, and both she and Officer Oliver identified Kelley in open court as the boy Ms. Collins identified at the funeral home.

While at the funeral home, Officer Oliver called for assistance and Officer Edward Sonne, along with his partner, responded. As Officer Sonne exited his car and began to approach Kelley, Kelley began walking away. Officer Sonne asked Kelley to stop, which he did, and the officer did a protective patdown of Kelley, recovering a loaded .25-caliber semiautomatic handgun from Kelley's right pants pocket.

On August 2, 1994, at approximately 2 p.m., Ms. Collins and Mr. Cole viewed the same lineup at Area 2 police headquarters, both consisting of seven black males in their late teens or early twenties, all with dark complexions. The participants in the lineup were approximately 5

feet 8 inches to 6 feet tall.  Additionally, three of the participants had braided hair.  Ms. Collins identified Kelley and Mr. Brown; Mr. Cole was unable to identify anyone.  On that same day, at approximately 6:15 p.m., Mr. Collins viewed a similar lineup with Detective John Ervin.  Mr. Collins identified Kelley as the boy staring at the car; he identified him again in open court during the trial.  Mr. Collins only tentatively identified Mr. Brown as the boy in the dark clothes. On August 11, 1994, Ms. Johnson viewed a similar lineup prepared by Detective Ervin; however, Mr. Brown was unable to participate.  Ms. Johnson identified Kelley again.

Assistant State's Attorney ("ASA") Peter Faraci of the felony review unit testified that, on August 2, 1994, he was assigned to the murder of K.T.  At approximately 5:05 p.m., he went to an interview room where Kelley was present with Detective Ervin.  ASA Faraci introduced himself and recited to Kelley his *Miranda* rights from memory.  After indicating that he understood his rights as recited, Kelley waived his rights and wanted to speak.  Kelley informed ASA Faraci that, on July 25, 1994, at approximately 10:45 p.m., he was either at his aunt's house or with friends in the alley hanging out.  Two days prior, his cousin, Brian Hill, a "Black P Stone" gang member, was shot and killed in a drive-by shooting by a "GD," a rival gangmember. Kelley further stated to ASA Faraci that he believed that the drive-by shooting incident involved a light-colored or white, four-door Chevy.  However, he denied knowledge of the location or facts relating to K.T.'s homicide.

ASA Catherine Hufford testified that, on August 3, 1994, at approximately 8 p.m., Kelley was brought to the felony review room in Area 2 police headquarters to speak with her.  She introduced herself and recited to Kelley his *Miranda* rights from memory.  After indicating that he understood his rights as recited, Kelley again waived his rights and wanted to speak.  Kelley

originally told ASA Hufford that he was a "Blackstone" or "Stone" gang-member and that the Blackstones were at war with the Gangster Disciples over "turf." He further stated that his cousin, Brian Hill or "Ibir," had been killed by a Gangster Disciple on July 23, 1994, and his friend Alina had been shot in the same incident. Kelley denied being at 75th Street and Yates Boulevard at the time of the murder. Rather, he asserted that he was at his aunt's house at 6725 South Clyde Street at approximately 10:30 p.m. the night of the murder, smoking reefer and drinking. Defendant stated his uncle "Rocks" came to get him, saw what he was doing and let him stay outside; however, Kelley would not provide Rocks' real name, address or telephone number. Kelley further stated that his uncle Kash was visiting from Wisconsin and could verify his presence. He then provided ASA Hufford a telephone number to contact Kash.

ASA Hufford asked Kelley if he was worried that the .25-caliber gun recovered by police officers on July 29, 1994, was used in the shooting. Kelley responded, "No because I didn't have no nine millimeter." ASA Hufford replied, "Who said it was a nine millimeter?" After indicating that ASA Hufford told him the caliber of the weapon, to which she replied that she had not, Kelley stated, "I should have listened to my mother and kept my mouth shut. I don't want to talk to you no more." Kelley was then escorted out of the room.

Following the aforementioned testimony from the State's witnesses, the parties entered into a stipulation that Dr. Robert Kirschner, the medical examiner, would testify that K.T. died of severe cerebral injuries secondary to the single gunshot wound to the head. The parties further stipulated that a forensic expert by the name of Mr. Warner would testify that the bullet fragment removed from K.T.'s head was not suitable for comparison and, thus, he would be unable to testify as to its specific caliber. The State rested and the trial court granted Kelley's motion for a

directed verdict as to count VIII, aggravated battery based upon the permanent disfigurement of Mr. Cole.

Kelley presented four witnesses to corroborate Kelley's alibi: Kash Tahmir, Enewamah Tahmir, Melissa Williams and Angela Egeston. Additionally, Detective Jack Hines was called to impeach Ms. Collins' testimony that police officers only asked her what the perpetrators were wearing when they arrived at the hospital on July 25, 1994, to question her.

On December 16, 1996, following closing argument, the trial court found Kelley guilty of first degree murder, attempt (first degree murder) and armed violence. The trial court further ordered the remaining aggravated battery and aggravated discharge counts to merge with the attempt (first degree murder) count.

On February 20, 1997, after hearing and considering the presentence report, the arguments, the evidence and the factors presented in aggravation and mitigation, the trial court sentenced Kelley to an 80-year extended term sentence for the first degree murder charge, to be served consecutive to a 20-year sentence for the attempt (first degree murder) charge, totaling 100 years' imprisonment in the Illinois Department of Corrections.

Thereafter, Kelley appealed to the Illinois Appellate Court, First District, raising the following issues for review:

A)     Whether petitioner was denied effective assistance of counsel when trial counsel failed to investigate exculpatory evidence and interview witnesses;

B)     Whether petitioner was denied effective assistance of counsel when trial counsel failed to file a motion to suppress suggestive identification evidence;

C)     Whether petitioner was denied effective assistance of counsel when counsel made an improper statement during closing argument; and

D)       Whether the trial court erred in allowing the grand jury transcript to be read into the record during the sentencing hearing.

On March 31, 1999, the Illinois Appellate Court affirmed Kelley's conviction and sentence. Following the appellate court's decision, Kelley initiated proceedings in the Illinois Supreme Court by filing a petition for leave to appeal.  In his petition, Kelley raised for review the same four issues he presented to the appellate court.  On December 1, 1999, the Illinois Supreme Court denied Kelley's petition for leave to appeal.

Kelley then filed a post-conviction petition for review, arguing that 1) his trial counsel was ineffective in that he failed to move to dismiss the indictment as based on prejudiced testimony; and 2) his appellate counsel was ineffective for failing to challenge the competency of trial counsel on the same grounds.  The trial court denied Kelley's post-conviction petition, finding that Kelley's claims were res judicata and barred by the waiver doctrine.

Kelley then appealed the denial of his post-conviction petition, claiming that 1) his consecutive sentences should be modified to run concurrently; 2) sections 5-5-3.2(b)(4)(I) and 5-8-4(a) of the Criminal Code are unconstitutional; and 3) the trial court's sentence violated *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2002).  On May 13, 2002 the Illinois Appellate Court, First District affirmed the denial of Kelly's post-conviction petition and rejected his *Apprendi* argument.

Following the appellate court's decision, Kelley initiated proceedings in the Illinois Supreme Court by filing a petition for leave to appeal.  In his petition, Kelley raised only the *Apprendi* claim for review.  The Illinois Supreme Court denied the petition for leave to appeal on April 2, 2003.

Thereafter, Kelley filed the instant petition for writ of habeas corpus. In this petition, Kelley raises the following claims:

1) He was denied effective assistance of counsel when trial counsel failed to investigate and interview Melissa Collins and to move to suppress Ebony Collins's identification as based on improper assistance from Melissa Collins;

2) He was denied effective assistance of counsel when trial counsel failed to investigate evidence concerning the caliber of the bullet removed from K.T.'s head during the postmortem examination;

3) He was denied effective assistance of counsel when trial counsel failed to file a motion to suppress the identifications of him by Ebony Collins, Ronnie Collins, and Lashon Johnson as unreliable or the product of an unduly suggestive lineup;

4) He was denied effective assistance of counsel when counsel made an improper statement during closing argument;

5) The trial court erred in allowing the grand jury transcript to be read into the record during the sentencing hearing;

6) His sentence violates *Apprendi*;

7) He was denied effective assistance of counsel when trial counsel failed to move to dismiss the indictment as based on prejudiced testimony;

8) He was denied effective assistance of appellate counsel when appellate counsel failed to argue that trial counsel was ineffective by failing to move to dismiss the indictment as based on false testimony.

**DISCUSSION**

**A.      Procedurally Defaulted Claims**

Before this court can reach the merits of a federal habeas petitioner's claims, he must comply with two procedural requirements. *See O'Sullivan*, 526 U.S. at 848. First, he must exhaust his state remedies. State remedies are exhausted if they are fully and fairly presented to the state's highest court for a ruling on the merits or when no means of pursuing review remain available. *See id.* at 844-48 (citing 28 U.S.C. § 2254(c)); *see also Wilson* v. *Briley*, 243 F.3d

325, 327 (7th Cir. 2001). In this case, both Kelley and the respondent agree that Kelley's claims have been exhausted.

Having satisfied the exhaustion requirement, the federal habeas petitioner must next overcome the obstacle of procedural default. Procedural default occurs when a habeas petitioner fails to present a constitutional claim to the highest state court to which it may be appealed in the manner required by state law. *See Boerckel*, 526 U.S. at 845; *see also Engle* v. *Isaac*, 456 U.S. 107, 129, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) (state appellate courts must have chance to mend their own fences and avoid federal intrusion). A habeas claim may also be procedurally defaulted if the state court rests its judgment on an adequate and independent finding of procedural default under state law. *See Stewart* v. *Smith,* 536 U.S. 856, 860, 122 S. Ct. 2578, 153 L. Ed. 2d 762 (2002). Under Illinois law, waiver of a claim by failing to raise it at the appropriate point during trial or the appellate process is an independent and adequate state ground. *See* Whitehead v. Cowan, 263 F.3d 708, 726-27 (7th Cir. 2001).

Last, a federal court may not grant habeas relief on a procedurally defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman* v. *Thompson,* 501 U.S. at 750; *Anderson* v. *Cowan,* 227 F.3d 893, 899-90 (7th Cir. 2000).

In this case, respondent argues that Kelley's claim five is procedurally defaulted because the Illinois Appellate Court found that Kelley waived it by failing to raise it in a written post-sentencing motion with the trial court. Procedural default can occur when the state court declined to address a claim because the petitioner failed to comply with a state procedural

requirement. *Coleman*, 501 U.S. at 729-30. A finding of waiver is sufficient to preclude federal habeas corpus review. *Harris* v. *Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).

The Illinois Appellate Court stated that Kelley's claim that the trial court abused its discretion at the sentencing hearing by allowing the transcript of the grand jury proceedings to be admitted was waived. In pertinent part, the appellate court stated, "[I]n failing to file a written postsentencing motion with the trial court, as required, Kelley has waived any sentencing issues on appeal." Since the appellate court's decision rests on the enforcement of a state procedural rule, it cannot be reconsidered on a federal habeas petition. Accordingly, Kelley's claim five is procedurally defaulted.

Respondent next argues that Kelley's claims seven and eight are procedurally defaulted because he failed to fully and fairly present them to each appropriate state court before seeking review in federal court. A full and fair presentment requires that a petitioner present both the operative facts and controlling legal principles to the state court – a mere reference to a constitutional issue is not enough. *See Chambers* v. *McCaughtry,* 264 F.3d 732, 737-38 (7th Cir. 2001). Factors relevant to whether a habeas petitioner has fairly presented a claim to the state courts include whether petitioner's state court argument (1) relied on federal cases that engage in constitutional analysis; (2) relied on state cases that apply a constitutional analysis to similar facts; (3) asserted a claim in particular terms that call to mind a specific constitutional right; or (4) alleged a pattern of facts well within the mainstream of constitutional litigation. *See Wilson*, 243 F.3d at 327. Federal courts do not automatically conclude that a habeas petitioner has fairly presented his claim simply because he fulfills any one of these four factors. *See Molterno* v.

*Nelson,* 114 F.3d 629, 634 (7ᵗʰ Cir. 1997).  Instead, courts must carefully consider the specific facts of each case.  *See Bocian* v. *Godinez,* 101 F.3d 465, 469 (7ᵗʰ Cir. 1996).

Kelley does not dispute that he procedurally defaulted claims seven and eight.  Instead, Kelley attempts to show cause and prejudice for his failure to present those claims at every level of the Illinois courts, arguing that ineffective assistance of counsel is the reason for his default.  Kelley raised claims seven and eight in his post-conviction petition but failed to raise either claim in his appeal of that petition.  There is no right to effective counsel in postconviction hearings, *see Coleman*, 501 U.S. at 756-57, and thus, the failure of counsel in postconviction proceedings to raise issues does not constitute cause for default of those issues. 28 U.S.C. § 2254(I); *Pitsonbarger* v. *Gramley*, 141 F.3d 728, 737 (7ᵗʰ Cir. 1998) (citing *Coleman*, 501 U.S. at 756-57).  Since Kelley does not argue that federal review of his claims is necessary to prevent a fundamental miscarriage of justice, he is barred from bringing these claims in federal habeas.

**B.      Ineffective Assistance of Counsel Claims**

1.      Failure to Investigate Melissa Collins

In his claim one, Kelley argues that he received ineffective assistance of counsel because his trial counsel failed to investigate whether Melissa Collins "assisted" or "coached" her sister Ebony Collins into identifying him as being present on the night of the shooting.

The Illinois Appellate Court, the last court to address this claim, properly identified the two-part test employed in ineffective assistance of counsel claims.  It stated that Kelley was required to show that his trial counsel's representation fell below an objective standard of reasonableness and that a reasonable probability existed that the result of the proceedings would

have been different absent this inadequate representation. *Strickland* v. *Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The Illinois Appellate Court rejected Kelley's claim for two reasons: 1) there was no evidence in the record establishing that Kelley's trial counsel actually failed to interview and investigate Melissa Collins; and 2) since two other witnesses to the shooting identified Kelley in lineups and in open court, Kelley was not prejudiced even if his trial counsel failed to investigate Melissa Collins.

The appellate court's conclusion that the outcome of Kelley's trial would not have been different even if his trial counsel had investigated Melissa Collins is unassailable. There is no evidence that Melissa Collins coached her sister Ebony into falsely identifying Kelley as one of the shooters. More importantly, there is no reason to believe any such evidence could be discovered: Melissa Collins was not a witness to the shooting and since there is no evidence that she held an animus towards Kelley, there is no reason to believe that she had a motive to encourage her sister to falsely identify Kelley. As a consequence, even if Kelley's trial counsel had investigated Melissa Collins, there is no reason to believe that he would have discovered evidence helpful to Kelley's case. Regardless, even if he had and Ebony Collins's identification had been suppressed as a result, it would have been insufficient to overcome the lineup and in-court identifications of two other witnesses, since there is no suggestion that either of their identifications were influenced by Melissa Collins and they each had ample opportunity at the time of the shooting to observe the shooters. Accordingly, the Illinois Appellate Court reasonably concluded that Kelley cannot satisfy the second prong of the *Strickland* test.

2.      Failure to Investigate Caliber of the Bullet

Kelley next contends that his trial counsel's failure to investigate evidence concerning the caliber of the bullet removed from K.T.'s head during the postmortem examination, coupled with his stipulation of the ballistics evidence and corresponding medical examiner's testimony, constituted ineffective assistance of counsel.

At trial, the State argued that the gun used to shoot K.T. was a .9 millimeter. The only evidence linking Kelley to a .9 millimeter gun was the testimony of Assistant State's Attorney Catherine Hufford. As set forth above, Hufford testified that during an interview on August 3, 1994, she asked Kelley whether he was worried that the .25 caliber gun police took from him at the time of his arrest would connect him to the shooting of K.T. Hufford then testified that Kelley replied, "No because I didn't have no nine millimeter." Hufford maintained that she had not at that time advised Kelley that the police believed the caliber of the gun used to shoot K.T. was a .9 millimeter, so Kelley's reference to that caliber gun implicated him in the crime.

At the end of the State's case, the parties stipulated to the testimony of Dr. Robert Kirschner, a deputy medical examiner in the Cook County Medical Examiner's Office. The parties stipulated that Dr. Kirschner would testify that he performed an autopsy on K.T.'s body, on July 26, 1994, and that "a partially deformed medium caliber lead bullet..." was recovered from K.T.'s head. The parties also stipulated that Mr. Warner, a forensic expert at the Chicago Crime Lab, would testify that he subjected this bullet to analysis commonly accepted in the field of forensic science and firearms ballistic evidence, and that in his opinion the bullet was not suitable for comparison and thus he could not testify to its specific caliber.

Kelley contends that his counsel should have pursued and presented evidence indicating that the caliber of the bullet recovered from K.T.'s head was not a .9 millimeter. Had he done so, Kelley believes that he may have been able to mitigate the impact of Hufford's testimony as well as the testimony that several .9 millimeter shell casings were recovered at the scene of the shooting.

The Illinois Appellate Court rejected Kelley's claim, finding that:

> there is no evidence in the record that trial counsel failed to either interview Dr. Kirschner or investigate the evidence concerning the caliber of the bullet. Instead, defendant points this court to evidence of an autopsy report that is not contained in the record.
>
> In our view, the evidence does not support a holding that defendant was denied effective assistance of counsel. *See Kluppelberg*, 257 Ill. App. 3d at 527, 195 Ill. Dec. 444, 628 N.E.2d at 917. Moreover, a medical examiner is not qualified to testify as to ballistics testimony. *People* v. *Babiarz*, 271 Ill. App. 3d 153, 160, 207 Ill. Dec. 681, 648 N.E.2d 137, 143 (1995).[3]

The appellate court's decision is not contrary to, nor does it involve an unreasonable application of, the clearly established federal law regarding ineffective assistance of counsel. Even if it is assumed that Kelley's trial counsel failed to investigate the caliber of the bullet, there is no reason to believe that the outcome of Kelley's trial would have been different if he had. Kelley presents no evidence or argument to cast doubt on the State's forensic expert's finding that the bullet was not suitable for comparison, and any suggestion that the forensic expert's finding was part of an effort to frame Kelley for the shooting is incredible. If the

---

[3]The autopsy report referred to by the appellate court was a report prepared by the medical examiner wherein she speculated that the caliber of the bullet recovered from K.T.'s head may have been a .32 caliber. The appellate court dismissed Kelley's reliance on that report because it was not in the record and medical examiners are not qualified to testify regarding ballistics. This court declines to rest its decision on this ground, because the absence of the autopsy report in the record is a related, albeit unidentified, element of Kelley's claim of his counsel's ineffectiveness.

forensic expert was going to lie to assist the State, he would have testified that the recovered bullet was a .9 millimeter, not that it was unsuitable for comparison, since that testimony would have corroborated the State's assertion that .9 millimeter shell casings were recovered from the scene. Kelley asserts that his counsel should have argued that the shell casings were at the scene before the shooting, but that argument is also frivolous, as all of the eyewitnesses testified that multiple shots were fired and no other shell casings were found at the scene. Here again, any suggestion that the shell casings were planted by the police is unreasonable, because the police did not know at the time they identified the recovered shell casings that the State's forensic expert would be unable to identify the caliber of the bullet lodged in K.T.'s head, nor that Kelley would make an incriminating statement to ASA Hufford regarding a .9 millimeter gun, and thus they had no incentive other than to correctly and truthfully identify the caliber of the shell casings. Since, then, it is clear that the .9 millimeter shell casings found at the scene were fired from the murder weapon, it is almost certain that any investigation conducted by Kelley's trial counsel into the caliber of the bullet recovered from K.T.'s head would have found that the bullet was either not suitable for comparison or that it was .9 millimeter. As a consequence, the outcome of Kelley's trial would not have been affected by any investigation conducted by his trial counsel. Accordingly, Kelley cannot establish constitutionally ineffective assistance of counsel.

3.     Failure to Move to Supress Identifications as Unreliable

Kelley also argues that he was denied effective assistance of counsel because trial counsel failed to file a motion to suppress the identifications of him by Ebony Collins, Ronnie

Collins, and Lashon Johnson, each of which he argues was unreliable or the product of an unduly suggestive lineup.

The Illinois Appellate Court identified correctly the standard applicable to claims of ineffective assistance based on counsel's failure to file a motion to suppress. As the appellate court found, in order to prevail on such a claim, a petitioner must show that the motion to suppress would have been granted and that the trial outcome would have been different if the evidence had been suppressed. *Kimmelman* v. *Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583, 91 L. Ed. 2d 305 (1986). Thus, the first step in evaluating whether Kelley's counsel's performance was ineffective for failing to file a motion to suppress is to assess the relative merit of that motion.

The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification. *Stovall* v. *Denno*, 388 U.S. 293, 301-02, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil*, 409 U.S. at 198. As the Supreme Court has stated, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson* v. *Braithwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). Courts thus first assess whether the identification was unnecessarily suggestive, then assess whether the identification was nonetheless reliable. If an identification is reliable, it will be admissible even if the confrontation was suggestive. *See id*.

Kelley's argument that Ebony Collins's identification of him at the funeral home on July 29, 1994 was unreliable is unpersuasive. As the Illinois Appellate Court found,

> Ms. Collins had an opportunity to view defendant prior to the shooting as her vehicle was stopped at the intersection for a red light, and she testified in specific detail regarding what defendant was wearing, what she heard him say as the car passed, and where defendant was located both before and after the shooting. Ms. Collins demonstrated a good level of certainty that defendant was the shooter both at the initial identification and later at the lineup, and she testified that she had seen defendant around the neighborhood and knew his face.

Kelley argues that Ebony Collins had less than 39.5 seconds - the length of the red light - to observe the shooters. Even if that is true, 39.5 seconds is hardly an insufficient amount of time to make a reliable identification. Indeed, in many cases, courts admit the testimony of eyewitnesses who had far less of an opportunity to observe the persons whom they've been called to identify.[4]

Any remaining argument that Ebony Collins's identification of him at the funeral home was untrustworthy is predicated on the false premise that the identification was the product of the assistance of Melissa Collins. Since, as discussed above, that premise is baseless, Kelley's argument is properly rejected.

Kelley next contends that the August 2, 1994 lineup at which he was identified by Ebony Collins was unduly suggestive because he was wearing the same clothes as he was when Ebony Collins first identified him at K.T.'s funeral. The Illinois Appellate Court rejected the argument, finding, pursuant to *People* v. *Morisette*, 501 N.E.2d 781, 785, 150 Ill. App. 3d 431, 437, 103 Ill.

---

[4]It is undisputed that Officer Oliver took Ebony Collins to the funeral home to see whether she could identify either of the two individuals present at the shooting. Kelley refers to this as a showup identification. Kelley's characterization does not fit the circumstances of this case. A showup can best be described as a "single suspect [confrontation] wherein a witness is presented with one individual and asked if he can make an identification." *U. S. ex rel. Raymond* v. *People of State of Ill.,* 455 F.2d 62 (7th Cir. 1972) (quoting *United States* v. *Clark*, 294 F. Supp. 44, 49 (D.D.C.1968)). In this case, there is no evidence that the police suspected Kelley before he was identified by Ebony Collins, nor that the police in any way directed her attention to Kelley or suggested that he was the one who committed the crimes. Instead, the evidence shows that Ebony Collins identified Kelley from a large group of people without assistance or direction from the police. As such, the concerns raised by the Supreme Court in *Stovall* regarding showup identifications are not implicated in this case.

Dec. 464 (1ˢᵗ Dist. 1986) that "the fact that Kelley was dressed as he was at the time of the initial identification does not, in and of itself, render the lineup identification unduly suggestive. Rather, differences in the appearance of Kelley and other lineup participants go to the weight of the evidence, not its admissibility."

While the Illinois Appellate Court's finding that the lineup was not unduly suggestive is debatable, its ultimate conclusion is not. Since Ebony Collins made a reliable identification of Kelley at the funeral home, even if Kelley's counsel had successfully moved to suppress the later lineup identification, Ebony Collins's funeral home identification would have still been admissible. That identification, coupled with those made by the other witnesses to the shooting, rendered Ebony Collins's lineup identification cumulative. As a consequence, Kelley cannot show that the results of his trial would have been different but for his counsel's alleged ineffectiveness.

Kelley next argues that his counsel should have moved to suppress the lineup identification by Ronnie Collins ("Ronnie"). Kelley contends that the discrepancy between Detective Ervin's report and the trial testimony of Ronnie and Detective Ervin regarding Ronnie's identification shows that the identification was the product of improper suggestion.[5]

On August 2, 1994, Ronnie viewed a lineup at the police station of four African-American males. Ronnie testified at trial that he choose Kelley in the lineup, and that Kelley was in position number one. Detective Ervin, the police officer that conducted the lineup,

---

[5]The Illinois Appellate Court did not specifically discuss this claim. Instead, the appellate court appears to have summarily rejected it on the grounds that even if the lineup was suggestive, Kelley would not have succeeded on a motion to suppress because Ronnie Collins had an independent basis for his identification. Since this court ultimately agrees that a motion to suppress Ronnie Collin's lineup identification would have been unsuccessful, it finds that the appellate court's decision denying Kelley's claim was not unreasonable. Nevertheless, this court elects to give the claim a more extended discussion and rejects it on different grounds.

corroborated Ronnie's testimony. Detective Ervin admitted, though, that his report regarding the lineup indicated that Ronnie had identified the person in position number two and that that person was Kelley. Detective Ervin explained that, earlier in the day, he had conducted a different lineup also involving Kelley and Jernel Brown. In that lineup, Kelley was in position number two and Brown was in position number three. Ebony Collins picked Kelley out of that lineup. Detective Ervin testified that he prepared a report following that lineup indicating the placement of the persons in the lineup, which he then saved on his computer. When he prepared a similar report of the second lineup - the one viewed by Ronnie - he opened the file containing his report of the first lineup and updated the information. Detective Ervin then testified that he failed to change the data entry field indicating the positions of the lineup participants. That oversight, Detective Ervin maintained, explains the discrepancy between his report of the second lineup and his trial testimony.

Kelley accounts for the inconsistency differently. Kelley regards Detective Ervin's report of the lineup as true and correct. Kelley speculates that Ronnie picked the person in position number two at the direction of Ebony Collins, who had picked Kelley in that position out of a lineup she viewed earlier in the day. Kelley seems to surmise that Detective Ervin then falsely reported that Kelley had been in position number two and that he had been picked by Ronnie. Next, Kelley must theorize that Detective Ervin advised Ronnie that he would need to testify at trial that he had picked the person in position number one: Kelley.

Kelley's theory is entirely speculative. The only evidence Kelley cites in support of it is the fact that the data entry field in Detective Ervin's report of the second lineup indicates that Ronnie's identification was "tentative." Since this term does not appear in the same data entry

field in Detective Ervin's first report, Kelley concludes that Detective Ervin's testimony that he did not alter that data entry field when preparing his second report, which Detective Ervin maintained resulted in the mistaken identification of Kelley as the person in the second position in the second lineup, was incredible. Kelley's conclusion is on its face plausible enough, but it does not stand up when considered in the context of Kelley's larger cover-up theory.

First, if Detective Ervin was attempting to frame Kelley by manufacturing a lineup identification of him by Ronnie, there would be no reason for him to then undermine the value of that identification by characterizing it as "tentative". Instead, if Kelley's theory were true, Detective Ervin would have labeled Ronnie's identification as firm. Next, Kelley cannot explain why Detective Ervin would indicate in the report that Ronnie had picked the person in position number two. If Detective Ervin was going to lie on the witness stand by testifying that Ronnie had picked the person in position number one when in fact he had chosen the person in position number two, Detective Ervin would have first told that lie in his report of the lineup and not undermined his credibility by creating a record that would directly contradict his trial testimony. Finally, Kelley's suggestion that Ebony Collins instructed Ronnie to blindly pick the person in position number two is speculative. Neither Ebony Collins nor Ronnie would have had any reason to believe that Kelley would be in position number two in the second lineup, and thus, if Ebony Collins was going to assist Ronnie in picking Kelley, she would have identified some distinguishing characteristic that Ronnie could recognize regardless of Kelley's placement in the lineup.

For these reasons, it is clear that Detective Ervin's lineup report would not have been a basis to suppress Ronnie's identification of Kelley. As a consequence, the Illinois Appellate

Court's conclusion that Kelley's claim that his counsel was ineffective for failing to move to suppress the identification was reasonable.

Finally, Kelley argues that the August 11, 1994 lineup from which Lashon Johnson identified him was unduly suggestive because he was the only lineup participant with hair long enough to be braided. The August 11, 1994 lineup took place more than a full week after the shooting. Lashon Johnson, therefore, would have known that the two suspects would have had ample time to change their hairstyles and that he would likely have to make an identification based on some other distinguishing characteristic. That belief would have only been reinforced when he viewed the lineup because none of the participants wore their hair in braids. Thus, Kelley's "afro" hairstyle did not draw attention to him because his hairstyle did not make it any more likely that he had worn braids on the night of the shooting than the short hairstyles of the other lineup participants. Therefore, the appellate court's finding that the August 11, 1994 lineup was not impermissibly suggestive was reasonable.

4.     Trial Counsel's Alleged Improper Statement During Closing Argument

In his claim four, Kelley argues that he was denied effective assistance of counsel when during closing argument his counsel stated, "We don't expect you to find Mr. Kelley innocent, that's not one of your choices and that's not anything we're asking for." Before the Illinois Appellate Court, Kelley argued that *People* v. *Hattery*, 488 N.E.2d 513, 109 Ill.2d 449, 94 Ill. Dec. 514 (1985) supported his claim. In *Hattery*, the Illinois Supreme Court found that a defendant's right to effective assistance of counsel was violated when, in his opening statement to the jury, the defendant's counsel stated:

> Ladies and gentlemen of the jury, [defendant] did it. He did everything [the prosecution] just told you. We are not asking you to find [defendant] not guilty. At the end of your

deliberations, you will find him guilty of murder. The question, and the only question facing you, will be whether to impose the death penalty on [defendant] for trying to save the life of his family.'" (Emphasis omitted.)

*Hattery*, 109 Ill.2d at 458-59. The appellate court found *Hattery* inapposite because in that case defense counsel had presented no evidence at trial and did not make a closing statement to the jury, whereas Kelley's counsel answered the State's presentation of the law and facts and adamantly attacked the sufficiency of the evidence throughout the trial. Based on Kelley's counsel's overall presentation, which included four alibi witnesses, the appellate court concluded that "the portion of defense counsel's closing argument that Kelley chose to attack is merely a statement about the ultimate finding that the court need not determine that Kelley was innocent, rather that the [State] had not proven him guilty beyond a reasonable doubt."

In his habeas petition, Kelley has made no effort to explain how the appellate court's decision was contrary to or an unreasonable application of United States Supreme Court precedent. Instead, Kelley reasserts his position that counsel's failure to assert Kelley's actual innocence was tantamount to an admission of guilt. Like the appellate court, this court disagrees. By instructing the court that it need not find Kelley innocent to find him not guilty, Kelley's counsel merely reminded the court that the State, not Kelley, bore the burden of proof. Far from prejudicing Kelley, his counsel's statement rightly concentrated the court's attention on the question of whether the State had proven Kelley was guilty and away from the legally impertinent question of whether Kelley had proven that he was innocent. The difference between the two is hardly subtle. Indeed, it embodies the constitutional guarantee that a criminal defendant is presumed innocent until proven guilty. If Kelley's counsel had failed to make the distinction, he might have been guilty of having rendered ineffective assistance of counsel.

Having highlighted that the burden of proof rested squarely on the State, Kelley's counsel made clear that Kelley did not have to prove his innocence because his innocence was presumed unless and until the State could prove that he was guilty. Accordingly, the appellate court's decision rejecting Kelley's claim was reasonable.

## C.    *Apprendi* **Claims**

Kelley argues that his sentence violates *Apprendi* because the trial court made factual findings that enhanced his sentence beyond the statutory maximum. First, Kelley contends that he was only exposed to a sentence of between 20 and 60 years' imprisonment for his conviction of first degree murder, see 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(a), but that he received an 80-year extended-term sentence under 730 Ill. Comp. Stat. 5/5-5-3.2(b)(4)(I) based on the court's finding that K.T. was less than twelve years old. Second, Kelley argues that the trial court imposed consecutive sentences on the first degree murder and attempted first degree murder convictions pursuant to 730 Ill. Comp. Stat. 5/5-8-4(a) based on its finding that he inflicted severe bodily injury.

Kelley's claims are unavailing. First, *Apprendi* "does not disturb sentences that became final before June 26, 2002, the day of its release." *Curtis* v. *United States*, 294 F.3d 841, 844 (7th Cir. 2002). Since Kelley's sentence became final on December 1, 1999 - the day his petition for leave to appeal from his direct appeal was denied - Kelley cannot sustain a claim based on *Apprendi*.[6] Even if *Apprendi* applied retroactively and the court assumes that an *Apprendi*

---

[6]Kelley's reliance on *People* v. *Swift*, 781 N.E.2d 292, 202 Ill.2d 378, 269 Ill. Dec. 495 (Ill. 2002) is misplaced. *Swift* did not involve the retroactive application of *Apprendi* because in that case the petitioner's sentence had not become final before *Apprendi* was decided. As such, *Swift* is inapposite.

violation had occurred in this case, Kelley's claim would still fail.[7]  Kelley concedes in his brief in support of his present petition that K.T. was less than twelve years of age, and the finding that Kelley inflicted severe bodily injury is implicit in the court's finding that Kelley was guilty of first degree murder for the death of K.T. and is also supported by the undisputed evidence that Ronnie Cole was shot twice in the right arm.  Thus, had these issues been submitted to the court, there is no doubt that they would have been resolved against Kelley.  As such, since Kelley's sentence was unaffected by any *Apprendi* error committed in this case, there is no basis to vacate his sentence.  *United States* v. *Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (holding that an *Apprendi* error does not require automatic reversal).

## CONCLUSION

For the foregoing reasons, Kelley's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [# 1] is denied.  The case is terminated.

Dated: June 14, 2007              ENTER: _____

                                      JOAN HUMPHREY LEFKOW
                                      United States District Judge

---

[7]With respect to Kelley's *Apprendi* claim regarding the imposition of consecutive sentences, the Illinois Supreme Court has held that *Apprendi* does not apply to consecutive sentences under 730 Ill. Comp. Stat. 5/5-8-4(a). *See People* v. *Carney*, 752 N.E.2d 1137, 196 Ill.2d 518, 529-35, 256 Ill. Dec. 895 (Ill. 2001) (concluding that *Apprendi* does not restrict the imposition of consecutive sentences as long as each individual sentence is within the unextended statutory range); *People* v. *Wagener*, 752 N.E.2d 430, 196 Ill.2d 269, 286, 256 Ill. Dec. 550 (Ill. 2001). Thus, it is clear that this claim is without merit.